

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-12-00479-CV

**UPSILON L.P.**, Individually and d/b/a North Texas Nissan,
Appellant

v.

**NEW CAR CONCEPTS**, and Gregory Edgington,
Appellees

From the 158th District Court, Denton County, Texas
Trial Court No. 2008-20166-158
The Honorable Steve Burgess, Judge Presiding

Opinion by:     Rebeca C. Martinez, Justice

Sitting:        Catherine Stone, Chief Justice
                Karen Angelini, Justice
                Rebeca C. Martinez, Justice

Delivered and Filed:  August 30, 2013

REVERSED AND RENDERED IN PART; AFFIRMED IN PART

Upsilon L.P. ("Upsilon"), Individually and formerly d/b/a North Texas Nissan, appeals the judgment awarding New Car Concepts and Gregory Edgington lost profits arising out of Upsilon's breach of a contract requiring it to use New Car for automobile paint and body work. Because there is no evidence to support the award of lost profits, we reverse the portion of the trial court's judgment awarding damages and attorneys' fees to New Car and Edgington and render a take-nothing judgment against them. We affirm the portion of the judgment awarding damages to Upsilon.

**FACTS AND PROCEDURAL HISTORY**

In 2006, Upsilon decided to close the paint and body shop located on the premises of its North Texas Nissan ("NTN") dealership. On August 29, 2006, Upsilon entered into a written "Agreement for Services" (the "Contract") providing for the out-sourcing of paint and body work to New Car Concepts ("New Car" or "NCC"), an automobile paint and body shop operated by Gregory Edgington. The Contract provided in relevant part, "NTN agrees to utilize NCC as its *exclusive provider* of paint and body services for NTN customers." (emphasis added). In turn, New Car agreed "to provide paint and body services to NTN customers" and to reimburse NTN monthly for 10% of the total labor charged on "each NTN job." It was further agreed that NTN would continue to intake paint and body jobs at its dealership, and that New Car would transport the vehicles to and from NTN, "including the return of the customer's vehicle to NTN, as necessary." New Car agreed to perform its services "to the highest professional standard," and to provide a lifetime warranty on all services performed on any NTN job. New Car agreed to indemnify NTN against any claim arising from "any NCC job involving a NTN customer." The Contract also stated that, "NTN will provide the parts for its own vehicles being repaired by NCC (i.e.: "we owe" vehicles and vehicles in its inventory)" and that said vehicles would be repaired by NCC at a rate of $30 per hour for labor and $20 per hour on materials. The term of the Contract was five years. As part of the agreement, New Car agreed to purchase NTN's body shop equipment for $120,000; it executed a promissory note as part of the deal.

The parties performed under the Contract for a period of approximately one year, with Upsilon sending its customers' vehicles, plus many of its own vehicles, to New Car for paint and body work. On October 31, 2007, Upsilon terminated the Contract by sending written notice of cancellation. Six months later, Upsilon sold the assets of NTN to Orr Motors, which continued to

operate the car dealership under the name North Texas Nissan. Upsilon no longer operated any car dealership.

Edgington and New Car filed suit against Upsilon, individually and d/b/a North Texas Nissan, seeking to recover approximately $500,000 in lost profits based on Upsilon's breach of the Contract due to its early termination. Upsilon answered, pleading the affirmative defenses of prior material breach and anticipatory breach claiming New Car had failed to perform its services to the highest professional standards. Upsilon also asserted a counterclaim seeking recovery of $11,361.35 in withheld funds that New Car owed to it under the Contract.

A jury trial was held on New Car's breach of contract claim and Upsilon's counterclaim.[1] Each side presented testimony supporting their interpretation of the Contract, and the other side's breach. Edgington testified about his method for calculating New Car's lost profits. The jury found that Upsilon breached the Contract and awarded $77,250 in lost profits, plus $94,000 in attorney's fees, to Edgington and New Car. The jury further found that New Car did not breach the Contract and awarded no damages on Upsilon's counterclaim. The jury also found that Upsilon's breach was not excused by New Car's previous failure to comply with the Contract.

Upsilon moved for judgment notwithstanding the verdict on the jury's damages findings. The trial court granted the motion in part, finding that the evidence had conclusively established that New Car did owe $11,361.35 in withheld funds to Upsilon under the Contract. The final judgment awarded Upsilon an offset of $11,361.35 in damages against the $77,250 in lost profits awarded to Edgington and New Car. Upsilon then filed a motion for new trial and a motion to modify the judgment based on insufficiency of the evidence of breach of the Contract and to

---

[1] Fraud and DTPA claims brought by Edgington and New Car against Upsilon were dismissed by summary judgment.

support the damages award. Those motions were overruled by operation of law. Upsilon now appeals.

**BREACH OF CONTRACT**

Upsilon challenges the jury's findings on liability, asserting: (1) it did not breach the Contract because its plain language unambiguously made New Car the "exclusive provider" of body shop services *only* for Upsilon/NTN customers' vehicles, not vehicles owned by the dealership; (2) the evidence is legally and factually insufficient to support the jury's finding that Upsilon breached the Contract; and (3) if Upsilon did breach the Contract, the evidence conclusively proved its breach was excused by New Car's prior material breach in failing to perform its services to the highest professional standard. Upsilon also argues the trial court erred in allowing parol evidence and argument contrary to the Contract's plain terms and in failing to instruct the jury on the unambiguous meaning of the Contract.

### *The Contract*

Upsilon argues the Contract was unambiguous and, by its plain language, required it to use New Car as the exclusive provider of body shop services only for vehicles owned by Upsilon/NTN customers. Upsilon asserts that, prior to its termination of the Contract in October 2007, it did send all of its customers' vehicles to New Car for all paint and body work. Upsilon asserts it never sent any of its customers' vehicles to any other body shop during the effective period of the Contract, and therefore never breached the Contract. It claims its cancellation of the Contract in October 2007 was excused by New Car's prior breach by failing to perform its body work up to professional standards. Even if its cancellation was not excused, Upsilon argues the only period of "breach" would be the six-month period between the cancellation in October 2007 and the sale of all its assets in May 2008, after which time it no longer had any customers.

New Car and Edgington respond that under the terms of the Contract Upsilon/NTN agreed to use New Car as its exclusive provider of paint and body services for a period of five years. They assert there was no limitation as to the type of vehicle covered by the Contract, i.e., they interpret the Contract as applying to all Upsilon/NTN vehicles – including its own inventory vehicles, "we owe" vehicles, and customer vehicles. New Car and Edgington assert Upsilon breached the Contract by its early termination and by sending some of its vehicles to another body shop, Caliber Collision, during the term of the Contract.

### *Ambiguity of a Contract*

When a written instrument is worded such that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and the court construes the contract as a matter of law. *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Whether a contract is ambiguous is a question of law. *Schaefer*, 124 S.W.3d at 157. Ambiguity does not arise simply because the parties offer conflicting interpretations of the contract. *Id.* An ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations. *Id.* In construing the contract, the court must give effect to all the provisions so that none will be rendered meaningless. *Id.*; *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005) (reviewing court construes the contract as a whole). The court must give the contractual language its ordinary and generally accepted meaning unless the contract shows that particular words used are intended to be given a different or technical meaning. *Schaefer*, 124 S.W.3d at 158.

Upsilon argues there is only one reasonable interpretation of the Contract's plain language concerning exclusivity, and it clearly only applied to Upsilon/NTN customer vehicles. We agree. The disputed provision of the Contract states, "NTN agrees to utilize NCC as its exclusive provider of paint and body services for NTN customers." It is the only provision in the Contract which

states New Car (NCC) will be the "exclusive provider of paint and body services," and it is expressly limited to "NTN customers." Looking at the Contract as a whole, it treats NTN customer vehicles and NTN vehicles differently. The provision that discusses paint and body services for NTN's "own vehicles" does not include any reference to New Car as the exclusive provider of those services, stating only that "NTN will provide the parts for *its own vehicles* being repaired by NCC (i.e.: "we owe" vehicles and vehicles in its inventory)," and stating a (presumably discounted) rate of $30 per hour for labor and $20 per hour for materials. Further, New Car's agreement to indemnify Upsilon/NTN is limited to "any NCC job involving a NTN customer." Viewing the Contract in its entirety, it clearly makes distinctions between NTN customer vehicles and NTN's own vehicles, which distinctions would be rendered meaningless under the interpretation urged by New Car. Construing the plain ordinary meaning of the disputed provision, in the context of the entire Contract, we conclude it unambiguously limited the exclusivity promise to vehicles belonging to Upsilon/NTN customers.

*Sufficiency of the Evidence of a Breach*

Upsilon next argues the evidence is legally and factually insufficient to support the jury's finding that Upsilon breached the Contract. *See City of Keller*, 168 S.W.3d at 813 (in evaluating legal sufficiency, the reviewing court considers all the evidence, including all reasonable inferences, in the light most favorable to the verdict); *see also Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (party challenging factual sufficiency of the evidence on an issue on which it did not have the burden of proof, must show the evidence supporting the adverse finding is so weak that the finding is clearly wrong and unjust).

Under our construction of the Contract, the issue becomes whether there is sufficient evidence that Upsilon sent any customer vehicles needing paint and body services to a body shop other than New Car during the term of the Contract. The only evidence in the record specific to

customer vehicles being sent to another body shop is the testimony by Ahmad Haghiri, a former employee of Upsilon/NTN, who stated that he was aware that NTN was sending some customer vehicles to Caliber Collision body shop during the term of the Contract. Specifically, Haghiri testified on this issue as follows:

> Q:     At some point during the term of the contract, were you made aware that North Texas Nissan was sending some vehicles to Caliber for repair?
>
> A:     Yes.
>
> Q:     And what types of vehicles were going over to Caliber for repair?
>
> A:     Some of the used car, new car and some of the customers that they went to service drive.
>
> Q:     And had you been told previously that all that customer work was supposed to be going to New Car Concepts?
>
> A:     Correct. Yeah.

Upsilon argues Haghiri's testimony was vague hearsay, and amounts to only a mere scintilla of evidence and is thus legally insufficient. *See City of Keller*, 168 S.W.3d at 813 (evidence is legally sufficient if it constitutes "more than a scintilla," which means that it would enable reasonable and fair minded people to differ in their conclusions). Upsilon further points out that the Caliber Collision Center invoices admitted as PX-7 do not identify whether any particular vehicle it repaired belonged to Upsilon/NTN or to a customer of Upsilon/NTN. Upsilon asserts that all the vehicles it sent to Caliber Collision during the term of the Contract were its own inventory vehicles or "we owe" vehicles, and none were customer vehicles. In addition, Upsilon stresses that Kevin McGowan of Caliber Collision contradicted Haghiri's testimony, stating that his company's invoices in PX-7 did not include any Upsilon/NTN customer vehicles. Finally, Upsilon relies on Edgington's admission on cross-examination that he did not know of a single customer that Upsilon failed to send to New Car.

Assuming, without deciding, that Haghiri's testimony constitutes more than a scintilla of evidence that Upsilon breached the Contract by sending customer vehicles to Caliber, we proceed to the next issue — whether the evidence is sufficient to support the amount of damages awarded to New Car and Edgington as a result of the breach.

**DAMAGES**

Upsilon argues there is no evidence, or factually insufficient evidence, of *any* lost profits resulting from a breach of the Contract, and, alternatively, of the amount of lost profits awarded.

### *Lost Profits*

Recovery of lost profits does not require that the loss be susceptible to exact calculation, but the amount of loss must be shown by "competent evidence with reasonable certainty." *Szczepanik v. First Southern Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994) (per curiam). What constitutes reasonably certain evidence of lost profits is a fact intensive determination. *Id.* (citing *Holt Atherton Ind., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)). "At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained." *Id.* Moreover, lost profits must be predicated on one complete calculation. *Id.*; *Holt*, 835 S.W.2d at 85. When a review of the surrounding circumstances establishes that the profits are not reasonably certain, there is no evidence to support the award of lost profits. *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 50 n.3 (Tex. 1998).

### *Evidence of Lost Profits*

Upsilon asserts that New Car failed to present any coherent calculation, based on objective facts and data, from which its lost profits could be determined with "reasonable certainty," rather than with mere estimates and speculation. Upsilon argues the damages award also fails because New Car's basis for calculating its lost profits was based on *all* the vehicles that Upsilon/NTN sent

to New Car before termination of the Contract, with no segregation between Upsilon/NTN's customer vehicles and Upsilon/NTN's own vehicles. Upsilon further points out that the Caliber Collision invoices do not identify the Upsilon/NTN vehicles it repaired as either customer vehicles or Upsilon/NTN-owned vehicles. Upsilon therefore contends there is no evidence of any specific amount of profits lost by New Car as a result of an Upsilon/NTN customer vehicle being repaired by Caliber Collision or any body shop other than New Car. We agree.

The evidence of lost profits admitted at trial consisted of: (1) Plaintiff's Exhibit 5 (PX-5), consisting of a series of monthly statements, created by Edgington, listing the gross revenue from sales for parts and labor for all work performed for Upsilon/NTN from September 2006 through October 2007; (2) Plaintiff's Exhibit 7 (PX-7), consisting of a series of invoices from Caliber Collision covering the period of August 2006 forward showing it did repairs for Upsilon/NTN during the five-year term of the Contract; and (3) Greg Edgington's testimony about New Car's lost profits and the methodology he used to calculate the lost profits based on PX-5. As noted by Upsilon, the New Car monthly statements (PX-5) are evidence of gross revenues from *all* the Upsilon/NTN vehicles sent to New Car, and the Caliber Collision invoices (PX-7) are evidence of repairs done by Caliber on all the vehicles sent by Upsilon/NTN — neither exhibit segregates the statements or invoices between customer-owned vehicles and Upsilon/NTN-owned vehicles. It is not possible to determine from either exhibit whether any particular repair was for a customer vehicle or an Upsilon/NTN vehicle.

As for Edgington's testimony, he extrapolated from the monthly gross revenues shown on PX-5 to state that New Car's net profits were 17 to 20% of their gross profits, which were 46% of the gross revenues shown on PX-5. Edgington stated that New Car made $9,000 to $10,000 per month in "net profit" from NTN business. Upsilon complains that these figures were inflated and were mere estimates of New Car's profits based on all of its NTN business prior to the October

2007 termination of the Contract. Even taking at face value Edgington's statement that New Car's monthly net profits were $9,000 to $10,000, it does not constitute any evidence of net profits for Upsilon/NTN customer vehicles, and he did not provide any objective factual basis for calculating net profits attributable solely to lost repairs on Upsilon/NTN customer vehicles. Edgington also testified that the Caliber Collision invoices admitted as PX-7 show that Upsilon/NTN sent $12,000 worth of work to Caliber Collision from August through December 2006, and $63,791 worth of work from January through December 2007. We agree with Upsilon that this testimony constitutes no evidence of lost profits under the Contract because the Caliber invoices do not contain a single invoice identified as an Upsilon/NTN customer vehicle.

Viewing Edgington's testimony in the light most favorable to the verdict, he provided no evidence of any calculation of lost profits stemming from lost repairs on any customer-owned vehicle not sent by Upsilon/NTN. Accordingly, we conclude that there is no evidence to support the award of $77,250 in lost profits to New Car and Edgington.

### CROSS-POINTS

New Car and Edgington raise two cross-points on damages in their appellee's brief, asserting the trial evidence conclusively proved they actually sustained lost profits of $460,000, and that Upsilon was not entitled to the award of $11,361.35 which it received in the judgment. These cross-points seek to alter the judgment, and thus New Car and Edgington were required to file a separate notice of appeal in order to raise these arguments on appeal. Because they did not do so, the issues are not before us. *See* TEX. R. APP. P. 25.1(c) (party who seeks to alter trial court's judgment must file a notice of appeal; appellate court may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause).

## CONCLUSION

Based on the foregoing reasons, we reverse the portion of the trial court's judgment awarding damages and attorneys' fees to New Car and Edgington and render a take-nothing judgment against them. The portion of the judgment awarding Upsilon $11,361.35 in damages is affirmed. Given our disposition, we need not address the other appellate issues raised by Upsilon.

Rebeca C. Martinez, Justice